Good morning, Your Honors. May it please the Court. My name is Ronald Katz. With me is Eugene Hamm. I'd like to reserve five minutes for rebuttal. There is a correct way of creating a post-sale restriction without uprooting the important and fundamental concept of privity. That way is actually set out in a case that is cited in our brief, a Federal Circuit case called Monsanto v. McFarling, 302 F. 2nd 1291, 2002 case. And that says at 1293, Monsanto authorizes various companies to manufacture the patented seeds, which are then sold to farmers. Monsanto requires that the sellers of the patented seeds obtain from the farmers slash purchasers a, quote, technology agreement, close quote, and the farmers pay a license fee to Monsanto of $6.50 per pound for a 50-pound bag of soybean seed. The reason that that proper way wasn't followed in this case is that Lexmark had this problem of an antitrust violation. They could not tell people downstream from them in the distribution chain what price to charge, which was a key component of the prebate. That was admitted by Mr. Omer at the hearing, and it appears in our excerpt of record, tab 24, page 772. Lexmark, it's undisputed that Lexmark sold to distributors without any condition regarding price or anything else. There certainly was no condition regarding returning the cartridge to Lexmark because that condition is only activated by opening the package, and Lexmark knows that its distributor is not opening the package. They're just passing it on. If we look at the lower court decision, 290F sub 2nd at 1038, we can see that from on page 1038, from the court's description of the prebate program itself. This is on the box, and both the old and the new, well, here's the old one. The old one says, opening this package or using the cartridge inside confirms your acceptance, et cetera. And the new one says, opening this package or using the patented cartridge inside confirms your acceptance. It's undisputed.  So you're saying that if the first sale goes to a distributor, that ends their ability to impose any conditions on the use of the cartridge? Right. Beyond that. They have no ability with respect to price. They've admitted that. On price. Because that would be an antitrust violation. Well, but there's law that says because it is. I mean, even the Mallinckrodt decision recognizes the Supreme Court line of authority that says you can't use a post-sale restriction to tie or to price fix. Absolutely not. That's understood. But they also in that decision say they're not going to invoking GTE Sylvania. They say we're not. The form isn't controlled. The substance is what counts here. And in this case, it's passing through. Now, applying that analysis to the current case, it's passing through the distributor. The first user is the one that opens the package. And the user is told the condition of this is that you not use, you not repair or refill it. Well, I agree that we should not elevate form over substance. I don't think privity is form over substance. Well, but the Mallinckrodt decision dealt with that issue, and you're citing the Fed Circuit in its Monsanto case. So what's the difference between Mallinckrodt in this case? The Mallinckrodt decision expressly did not side, did not decide the contract issue. It sent it back, sent it back for the contract issue to be decided. What the Mallinckrodt case said is we're not going to put a patentee in a worse position than anyone else. It's established in our law. You can make a post-sale condition. You can do that. And we're not going to disable patentees from doing that. With respect to price, they are disabled. There's no question about it. There are no other restrictions that they are. They are disabled, but it's not because of privity. They are disabled because of the antitrust law. Right. Right. So they make a deal. We're not making an antitrust claim here. No. We're making a deception claim, a 17-200. Right. And the claim is that the deception is that people believe that they have some sort of obligation, legal obligation, when they don't. Well, that's the legal conclusion. Mallinckrodt says they can patentee as long as they aren't expanding the patent. Can't. Now, they expand the patent beyond its proper use when they get into pricing and when they get into time. Do they expand it when they put a condition on, as they did in Mallinckrodt, about the single use? Your Honor, there is nothing in the Mallinckrodt case that eliminates the concept of privity. In fact, the contract in the Mallinckrodt case, there was privity. It was between Mallinckrodt and the hospital. That's the one that they were trying to enforce. The Mallinckrodt case says nothing about privity. So what's the thrust of privity here? Why is that important? The first user, the first user that has the opportunity to invoke the patented item that they don't want to use more than once is the purchaser who's going to put the cartridges into its printing machine. And what does that user think? Thinks that I have my choice. I can either go out. I don't have to buy this cartridge. I can go buy a different cartridge that doesn't have that restriction on it if I want to refill it. Well, what that user thinks is exactly the error that was made below, Your Honor. That user thinks that in exchange for a lower price, he or she has an obligation to return this cartridge to Lexmark. And if we look at the lower court decision at page 1044 at the bottom, it says, Moreover, the Lexmark purchaser has accepted the single use condition in exchange for a lower price. This patented cartridge is sold at a special price. Lexmark cannot tell that to anyone. Lexmark does not know. They cannot know and they cannot say what the price is at which it's going to be sold. That is a misleading statement. That is what causes the customer to believe that he or she has to return this. And that is misleading and it has worked. They have increased, as they have admitted themselves, their returns by 300 percent. Well, I'm not sure what point you're making. The misrepresentation is that what's the misrepresentation? The misrepresentation is we, Lexmark, are giving you a break on price in exchange for you returning it. Well, that's true, isn't it, at the time? No, it's not true. Well, Lexmark is, isn't it? Lexmark gives nothing to the end user. And Lexmark cannot control what the end user gets. Counsel, wouldn't your argument have more validity if there were in the record that Lexmark's distributors were selling at a higher price for these returnable cartridges than the ones that are coming out without their price? There are none without. Well, you know, the price will change with market conditions. Maybe it's higher. Maybe it's lower. That's not the point. The point is that Lexmark has no control over that, and Lexmark is saying to customers, we do control that. We're giving you a lower price. That is false. Lexmark is giving the customer no price. Lexmark has no control over that price, whether it's higher, lower, or the same. The Lexmark confirms this error in their brief on page 6 and 8. Well, I still, before you, I'm still trying to understand. You said the district court errs, as a matter of fact, because there's no evidence that the customer, in fact, gets a lower price. But is the sine qua non of their representation that there's a lower price? Or is the representation true that they are obliged, if they open this package, they're obliged to use it only once? It's why. Why are they obliged? What is the consideration coming from Lexmark? You know, you just get a package. You don't know what your obligations are. They're telling you, well, you have an obligation to do this because we're giving you a special price. They say that. It's actually in the, if you look at the prebate language itself, which is in the case below also, I think at 1038, it says that. It says, in the new one, it says, this patented cartridge is sold at a special price. That is just false. They have no reason. They can't know. They can't say, and they can't control it. That is just a misleading statement, and it won't. Kennedy. If it says the price comes from Lexmark, but what you're saying is this package is being sold at a special price, isn't there a very vast difference under your factual and legal analysis? Lexmark cannot tell them that it's being sold at any price, whether it's special, not special. Lexmark has no way of knowing and no way of controlling whether that price is special or not. They don't. They can't. This is confirmed if you look at their brief. On page 6, for example, they talk about the alternatives that the customer has. On page 6 of their brief, in the second full paragraph, it says, the second alternative of the consumer was to purchase a Lexmark cartridge priced $30 less than the regular cartridge subject to the condition that the customer would return the empty cartridge only to Lexmark for remanufacturing and or recycling. So here they are saying, well, they're purchasing it for $30 less. They have no way of knowing that. And then they say it again on page 8. It's the same thing. They can't do this. They can't do this. Counsel, will you concede that Lexmark has the ability to sell a cartridge to its distributor independent of price, which is to be used only once, and also sell a cartridge which can be used multiple times? Lexmark does not sell to its distributors for use. Lexmark sells to its distributors to distribute. Distributors don't open it up. They don't use it. They just pass it on to the next person in the chain. So that's just not something that's in the factual context here. You're down to about two minutes. Pardon? You're down to about two and three-quarters minutes if you want to save some time. So I have only two and three-quarters minutes. Right. So I think I will thank the Court for that advice and save that for rebuttal if I might. Thank you. Just one second while we adjust the clock here. We have a one-time use timer, so we, you know, nothing we can do about it. Thanks, Cole. Thank you. Good morning, Your Honors. May it please the Court. I'm Dick Ulmer. I represent Lexmark. With me at the council table today are my colleague Jim Day and Andy Logan from Lexmark. Let's start out by addressing this notion that we don't have any way of knowing whether the prebate discount gets to the end user or not. We do have a way of knowing, and it's in the record of this case. But you do have your way of controlling it. Well, we do know, however, that Lexmark sells in the first instance the prebate cartridge for $30 less than the non-prebate cartridge. To the distributor. To the distributor or directly to the customer if the sale is through the Internet. We know from the testimony of the depositions that ACRA took, and they ask those distributors, the people who are actually out there on the front lines, and each of those witnesses said there is no way that I cannot pass that discount along because the competition in this industry is so fierce that I must do so. That's the evidence in this case. There's no evidence to the contrary. If that were not the case, that would be something for Lexmark to look at. But it is the case, and that is undisputed, the special price does get to the consumer. I'd also like to point out. But there's no way you can control that. Isn't that the point? There's no way you can control that. It turns out to be true now in this market, but you cannot control the price. It is an accurate statement that the customer is getting a special price. That's true. That's undisputed on this record. The other point there is that that isn't the only consideration that the end user is getting. In fact, Lexmark wouldn't need to provide that discount at all. Think of this in terms of the usual bundle of sticks of property rights. What a patentee or a patent owner gets is a bundle of rights to exclude. They have a right to exclude others from making the patented article, from selling the patented article, from using the patented article. So what Lexmark does here is to put a condition on the article from the time it leaves Lexmark's hands. That condition passes through every purchaser. It's conditional all the way. This use stick is never in that bundle of rights that's sold to the distributor or on to the retailer. Only at the time that the end user or someone in the distribution chain could do the same, by opening the box and using the cartridge, you are accepting Lexmark's offer. I will give you this use right if you agree to the terms of my prebate license. Single use and return only to Lexmark. I would like to step back and briefly consider the context of this case, because context is very important here. First, this case is brought solely under California Business and Professions Code sections 17200 and 17500, and it is almost entirely under the false advertising provisions of those statutes. You must have liked that from an insurance standpoint. It's not an antitrust case, Your Honor, as you've already pointed out. It's not a patent infringement or patent misuse case. It's not a breach of contract case. It's not any other kind of case. It's a 17200, 17500 case. That's all that's been brought. Despite that fact, and this is interesting, neither section 17500 nor section 17200 is mentioned anywhere in the argument of appellant's opening brief on appeal. Nowhere. We turn to the amicus brief, 15 pages long. Neither of those statutes is mentioned anywhere in that entire brief. That's very important because what we're doing here is ignoring the causes of action that are really pleaded here, and there's a reason for that, which I'll get to in a moment. Second, the two main issues that are now being asserted on appeal are ACRA's notion of this contractual privity and the patent exhaustion doctrine. But neither of those issues was ever pleaded. I went through that complaint again this morning, looked in vain to find either the word privity or the word exhaustion. And this didn't get past Judge Armstrong below. She was very adamant about not liking the fact that this privity argument was raised for the first time in a reply brief on a summary judgment motion. That, Your Honors, is also very telling. Third, this is supposed to be a consumer protection case, but there's been no outcry from the businesses that Lexmark has participated in this program. Not one consumer is a plaintiff in this case. And as Judge Armstrong noted, there's no evidence, none, of any consumer who claims that they were misled, nor is there any evidence from an expert, which you would typically expect in one of these deception cases. No evidence whatsoever. And this is all despite the fact that the prebate program has been operating for eight years now. You would expect that the sophisticated businesses that are the customers for this program would have alleged that they were being deceived somewhere along the line during those eight years if they were. Mr. Olner, what is the state of the record for the meaning of the word special in the statement that's on the box? It's being sold at a special price. Lexmark sells the cartridge for, in the first instance, with respect to the Optra S program, it was $30. That was a 20 percent margin between the prebate and the nonprebate cartridge, and that has been maintained throughout the other programs that followed, the Optra SE and the Optra S. The percentage margin, 20 percent, has remained constant. That's the state of the record. But you think that when a consumer reads the box and reads the sentence, the patented cartridge is sold at a special price, they understand that that means it's the sale from Lexmark to its distributor, and not the price that the box is being sold at by the distributor or by the retailer to the customer. Well, as we've discussed earlier, Your Honor, the state of this record, it's undisputed. And typically, this would not be a situation where one went into Office Depot or a store like that to buy, but let's say that a business did that. They would go up to the shelf. They would say they would see a prebate cartridge and a nonprebate cartridge next to each other, and there would be a 20 percent difference because the competition is so fierce that that must be. But that happens because of the market. It certainly would be more accurate for you to contain, to put a complete description that you cannot control the price that the distributor sells a product, but you anticipate that they will sell it at less than the normal cartridge. Well, it is an accurate description. It is a special price. There's a lower price for the prebate cartridge than there is for the nonprebate cartridge. Well, that is – but that's something you can't guarantee. But it is factually true. Yes. I mean, the market – but supposing there was not a competitive market, then your argument would have less force. You must have been relieved when you got that – when the deposition testimony turned out favorably for you. It was a happy moment. But, you know, another point on this special price issue is that that hasn't been pleaded as an issue on appeal. The issues on appeal are this prebate issue, the exhaustion issue, and the lockout chip issue. That's not an issue on appeal. So when we look at these three factors that I've just talked about, the inescapable conclusion is that this appeal isn't really about this case at all. Instead, what it does is it seeks an advisory opinion about matters that are relevant to this case that aren't really before this Court. And let me make no mistake about it, Your Honors. The advisory opinions that are being sought are very far-reaching, and they're wholly unwarranted. Now, the amicus brief is right up front about what it wants. It wants this Court to create a split with the Federal Circuit's Mallincott decision. Now, as we've shown in our papers, Mallincott is well decided. It flows directly from the Sylvania case, Supreme Court case, back in the 70s. Mallincott has been the law for 13 years now. It's followed in courts across the country, and there's been no decision contrary to Mallincott. But even if one wanted to create a split with the Federal Circuit on this important issue of patent law, this wouldn't be the case to do it with. As the amicus points out, and Lexmark has said since prebate began, Mallincott holds that patent owners can, through conditional sales, impose post-sale restrictions on end users. So patent owners like Lexmark are free to impose post-sale restrictions. Your Honors, now let's tie back to the first thing I said. This suit is for false advertising. How could Lexmark possibly be liable for falsely advertising what is entirely true? The truth is that Mallincott has been controlling law throughout the entire time that the prebate program has been in effect, just as Lexmark said. That's what Lexmark has been saying all along. And I would point Your Honors to the record. In there is a document that's called In Defense of Prebate. It was written very early in the program, widely distributed throughout this industry. And you will see there on page 491 complete description of the Mallincott case. It said, this is what we, Lexmark, believe. We're relying on the Mallincott case. Next paragraph relies on the Pro CD case, which I'll get to in a moment. We've been very upfront about that, too. Now, ACRA itself also wants to create a circuit split here. This split would be with Mallincott, with the Seventh Circuit's Pro CD decision, and with the many other courts that have upheld shrink-wrap licenses. And the courts uphold those licenses whether the sale is directly from the manufacturer or if the sale goes through distribution channels. No difference. In fact, Pro CD itself, despite what ACRA has said in its briefs at times, was a sale from a retailer. And there's no indication in that case that there were any special contractual arrangements in the distribution chain. And that's because there doesn't need to be. If there's any doubt about it, there is privity in these cases. The privity is between Lexmark and the consumer. I, Lexmark, and this is right in the Pro CD case, I, Lexmark, am making you an offer. You can use this patented cartridge if you agree to the use terms that are being imposed. You open and use. You have accepted that agreement. That's Pro CD, and that's what we relied upon in setting up this program. Now, again, even if one wanted to create a circuit split here with Pro CD and all of these other cases, this wouldn't be the case to do it in. Lexmark has been saying all along, again, in this, in defense of prebate document as well as other places, that most courts hold shrink-wrap licenses to be legal. That's also at page 491 of the record. And that includes licenses on products that are sold through distribution chains, not just products that are sold directly from the manufacturer to the end user. And, again, it's important to keep in mind that this is solely a false advertising claim. It's not an antitrust claim or any other kind of claim. It's just a false advertising claim. So how could Lexmark possibly be liable for falsely advertising what is entirely true? The great weight of authority in courts around the country is that shrink-wrap licenses, whether they're directly from the manufacturer to end user or whether they go through a chain of distribution, are entirely legal. That's what Lexmark said. That's the fact. So what you're saying, that even if we were to conclude that it was improper and we disagreed with the Federal Circuit in that, we couldn't write that in this case because you're advertising until we declare it illegal in this case, your advertising would have been true? That's correct. This case doesn't mean that. What do we do? This case raises another. We're stuck? We're stuck with Malincroft? No. This case raises the issue of whether there's false advertising. If they had wanted to bring antitrust claims or some sort of deck relief action on this issue or some other way of actually properly putting the issue forward, they could have done that. They didn't do that. They just sued for false advertising. And this can't be false advertising when it's entirely true. Thank you, Your Honors. Thank you, Your Honor. The day of that deposition was a good day for me. Unfortunately, the district court misconstrued the deposition and was not as perceptive as Your Honor. Here, it's cited at page 11 of their brief. It's a distributor. Question, all right, could tech data reduce the size of the discount? For example, if they got a $50 discount from Lexmark, would they then give a $40 discount to the people they bought or they sold the cartridges to? Answer, yes. They could charge any price they want because Lexmark can't control them. But in a very competitive wholesale distribution market, there are too many competitors, really, to be able to do that. Okay. Where's the falsity in their representation? The falsity in the representation is that it's a special price. It is. Pardon? It is. You just said it was. It is not a special price. You said you read the testimony that says the market enforces the discount. So where's the falsity? First of all, one person, one distributor, cannot speak for the market on one day. Where's the falsity? It is the burden of proof is on you all to prove your case. Okay. Tab 9, page 328 to 330, these are the Lexmark document, frequently asked questions that they're telling people about this program. Okay? And if we look down at the middle of that page, question, why does Lexmark prohibit the pre-baked cartridges' reuse and re-questioning? It's Lexmark that's doing it. It's not. Lexmark is doing nothing to the consumer. Answer, Lexmark offers a regular price cartridge with regular terms and conditions. With the pre-baked cartridge, Lexmark encourages the return of the empty to Lexmark by selling the cartridge with the license to use it one time only. The empty has an approximate value to Lexmark or a refiller of an amount at least equal to the pre-baked amount. On page 329, still, this is a Lexmark document to consumers. You must still honor the terms of the pre-baked license agreement, ensuring that the empty is not resold or reused. Again, the false statement is we're giving you a special price. Question. How do you hear anything about a special price? Pardon? Where's the reference to a special price? Page 330. Question, how is the pre-baked discount determined? Answer, the discount off-list was set at an amount equal to at least the approximate value of the empty cartridge. Question, why are you giving me such a significant discount? Answer, Lexmark recognizes that empty cartridges have some residual value. And it goes on for a paragraph or so. I would cite Your Honor to this. It is undisputed that Lexmark is telling the consumer, you're getting a special price. And it is not at all clear, as Mr. Ulmer said, that a consumer would know that that special price is only going to the first link in the distribution chain. And after that, Lexmark has no control whatsoever. We are not asking Your Honors to split with the Federal Circuit. We love the Medapart case. It's a great case, because it says contract law still exists. Privity still exists. When they say in their brief, the jurisprudential ship on privity has sailed, that is preposterous. Here is what Medapart says. Private parties retain the freedom to contract concerning the conditions of sale. That's all it's about. You can make a contract. You can give away your right of repair. You can do anything you want. But you've got to be a party to the contract. You still have to have privity. Medapart says nothing about not having privity. There's no privity in this case. It is undisputed. There's no privity in this case. You do not have to split with Medapart. I would commend to Your Honors, I know I'm off my time now, the Pro CD case. I think Judge Esther Brooke, a very learned judge, really nailed it with respect to privity. And you can see in that decision that he doesn't mention privity in the decision. We've read the decision. Thank you. Thank you, counsel. It's a fascinating case, and we'll take it under submission. We'll stay with argument on the next case on the calendar, which is Beck versus Fort James Court.
judges: Thomas, Fisher, Robart